Kevin F. Kieffer (Bar No. 192193)
kevin.kieffer@troutman.com
TROUTMAN PEPPER HAMILTON SANDERS LLP
5 Park Plaza, Suite 1400
Irvine, CA  92614-2545
Telephone: 949.622.2700
Facsimile:  949.622.2739

Attorneys for Defendant
GREAT AMERICAN INSURANCE COMPANY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| BOARDRIDERS, INC., | Case No.  8:21-cv-01260-JLS-JDE |
| Plaintiff, | Hon. Josephine L. Staton |
| v. | **GREAT AMERICAN INSURANCE COMPANY'S ANSWER AND COUNTERCLAIMS TO COMPLAINT** |
| GREAT AMERICAN INSURANCE COMPANY, | |
| Defendant. | **JURY TRIAL DEMANDED** |
| GREAT AMERICAN INSURANCE COMPANY, | |
| Counter-Claimant, | |
| v. | |
| BOARDRIDERS, INC., | |
| Counter-Defendant. | |

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

Defendant Great American Insurance Company ("GAIC"), by and through its undersigned counsel, hereby submits this Answer and Affirmative Defenses to Plaintiff Boardriders, Inc.'s ("Boardriders") Complaint, and Counterclaim for Declaratory Judgment. GAIC denies that Boardriders is entitled to the judicial declaration sought or for any of the other relief. GAIC answers Boardriders' Complaint as follows:

## ANSWER TO COMPLAINT
## NATURE OF THE CASE

1.     GAIC admits only that this is a civil action by Boardriders resulting from an October 2019 ransomware attack, and that GAIC has overpaid millions of dollars to Boardriders for its claimed losses resulting from that attack. GAIC denies the remaining allegations in Paragraph 1 of the Complaint.

2.     GAIC admits only that it issued contract no. GA 0134, in respect of Policy No. OY70254CR, to Quiksilver, Inc., now known as Boardriders, Inc. ("Boardriders"), for the January 15, 2017 to January 15, 2020 policy period (the "Policy"), which, subject to its terms and conditions, provides coverage for "Extortion," among certain other types of events, and that Boardriders bought two cyber policies from another insurer that specifically cover the exact kind of losses resulting from ransomware attacks. GAIC further notes the Policy is a document that speaks for itself, and GAIC therefore denies the allegations in Paragraph 2 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the terms of the Policy. GAIC lacks knowledge or information sufficient to form a belief as to why Boardriders purchased the Policy or the extent of the damage the ransomware attack caused Boardriders, and on that basis denies these allegations. GAIC expressly denies that it has refused to honor the insurance coverage available under the Policy it issued to Boardriders. GAIC denies the remaining allegations in Paragraph 2 of the Complaint.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

3.      The Policy is a document that speaks for itself, and GAIC therefore denies the allegations in Paragraph 3 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the terms of the Policy.

4.      On information and belief, GAIC admits Boardriders relayed to GAIC that Boardriders experienced a ransomware event in October 2019 and the perpetrator demanded certain payments in bitcoins. The remaining allegations in Paragraph 4 of the Complaint either state a legal conclusion to which no response is required or for which GAIC lacks knowledge or information sufficient to form a belief as to the truth thereof, and GAIC therefore denies the remaining allegations in Paragraph 4 of the Complaint.

5.      The first sentence of Paragraph 5 of the Complaint asserts a legal conclusion to which no response is required. GAIC denies the allegations contained in the second sentence of Paragraph 5.

6.      GAIC lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 6 of the Complaint.

7.      GAIC admits only that Boardriders submitted partial information about certain expenses it claims were incurred to GAIC in March of 2020. The remaining allegations in Paragraph 7 of the Complaint merely characterize the nature of Boardriders' alleged losses, and on that basis GAIC denies the remaining allegations in Paragraph 7.

8.      GAIC admits only that, in June of 2020, Boardriders submitted additional information about costs and expenses, and a report of some claimed business interruption losses prepared by Crowe. GAIC denies the remaining allegations in Paragraph 8 of the Complaint.

9.      Denied.

10.     GAIC admits only that Boardriders has sought reimbursement for claimed expenses and business income losses under the Policy, for which GAIC has

overpaid Boardriders by millions of dollars. GAIC denies the remaining allegations in Paragraph 10 of the Complaint.

11.     Denied.

12.     Denied.

13.     The allegations in Paragraph 13 of the Complaint state a legal conclusion to which no response is required. To the extent a response is otherwise required, GAIC denies the allegations in Paragraph 13. GAIC expressly denies the allegation that it has acted in bad faith.

## JURISDICTION AND VENUE

14.     Admitted.

15.     Admitted.

## PARTIES

16.     On information and belief, admitted.

17.     GAIC admits that it is a company organized under the laws of Ohio with its principal place of business in Cincinnati, Ohio. GAIC further admits it is an authorized insurer in the State of California, licensed to sell insurance in California, and solicits and conducts business in California. GAIC also admits it maintains an office at 100 Pine Street, Floor 13, San Francisco, CA 94111. GAIC denies the remaining allegations in Paragraph 17 of the Complaint.

## FACTUAL ALLEGATIONS

### I.     The GAIC Policy

18.     GAIC admits that it issued contract no. GA 0134, in respect of Policy No. OY70254CR, to Quiksilver, Inc., now known as Boardriders, Inc. ("Boardriders"), for the January 15, 2017 to January 15, 2020 policy period (the "Policy").

19.     Paragraph 19 of the Complaint merely describes the nature of Boardriders' reference to the Policy in the Complaint, and for this reason no

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

response is required. To the extent a response is otherwise required, on information and belief, admitted.

20.     The Policy is a document that speaks for itself, and GAIC therefore denies the allegations in Paragraph 20 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the terms of the Policy.

21.     Admitted.

22.     GAIC admits only that, on information and belief, Billabong and entities it owns became a subsidiary of Boardriders in 2018. The remaining allegations contained in Paragraph 22 of the Complaint state a legal conclusion to which no response is required, and GAIC lacks information or knowledge sufficient to form a belief as to the truthfulness of the allegations contained in Paragraph 22. To the extent a response is otherwise required, GAIC denies the remaining allegations in Paragraph 22. GAIC expressly denies that Billabong is an Assured under the Policy because, despite repeated requests from GAIC, Boardriders has never provided the requisite documentations and information to substantiate the allegation that the market value of Billabong at the time of its acquisition by Boardriders was less than 25% of Boardriders' market value.

23.     The Policy is a document that speaks for itself, and GAIC therefore denies the allegations in Paragraph 23 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the terms of the Policy.

24.     The Policy is a document that speaks for itself, and GAIC therefore denies the allegations in Paragraph 24 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the terms of the Policy.

25.     The Policy is a document that speaks for itself, and GAIC therefore denies the allegations in Paragraph 25 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the terms of the Policy.

26.     The Policy is a document that speaks for itself, and GAIC therefore denies the allegations in Paragraph 26 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the terms of the Policy.

27.     The Policy is a document that speaks for itself, and GAIC therefore denies the allegations in Paragraph 27 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the terms of the Policy.

28.     The Policy is a document that speaks for itself, and GAIC therefore denies the allegations in Paragraph 28 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the terms of the Policy.

29.     The Policy is a document that speaks for itself, and GAIC therefore denies the allegations in Paragraph 29 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the terms of the Policy.

30.     The Policy is a document that speaks for itself, and GAIC therefore denies the allegations in Paragraph 30 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the terms of the Policy.

31.     The Policy is a document that speaks for itself, and GAIC therefore denies the allegations in Paragraph 31 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the terms of the Policy.

32.     The Policy is a document that speaks for itself, and GAIC therefore denies the allegations in Paragraph 32 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the terms of the Policy.

33.     The Policy is a document that speaks for itself, and GAIC therefore denies the allegations in Paragraph 33 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the terms of the Policy.

34.     The Policy is a document that speaks for itself, and GAIC therefore denies the allegations in Paragraph 34 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the terms of the Policy.

35.     Admitted.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

## II.     The Ransomware Attack

36.     GAIC incorporates its responses to Paragraphs 1 through 35 as though fully set forth herein.

37.     On information and belief, GAIC admits Boardriders relayed to GAIC that Boardriders experienced a ransomware event in October 2019 that impacted some of its global systems. Boardriders has not provided requested information as to the full scope and impact of that attack, and GAIC therefore lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 37 of the Complaint, and therefore denies the remaining allegations in Paragraph 37.

38.     Boardriders has not provided requested information as to the full scope and impact of the cyber-attack, and GAIC therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38 of the Complaint, and therefore denies the allegations in Paragraph 37.

39.     On information and belief, GAIC admits Boardriders relayed to GAIC that Boardriders experienced a ransomware event in October 2019 and the perpetrator demanded certain payments in bitcoins. Boardriders has not provided requested information as to the full scope and impact of the cyber-attack, and GAIC therefore lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 39 of the Complaint, and therefore denies the remaining allegations in Paragraph 39.

40.     GAIC admits only that, on information and belief, Boardriders opted not to engage in dialogue with or pay the perpetrator. Boardriders has not provided requested information as to the full scope and impact of the cyber-attack, and GAIC therefore lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 40 of the Complaint, and therefore denies the remaining allegations in Paragraph 40.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

41.     Boardriders has not provided requested information as to the full scope and impact of the cyber-attack, and GAIC therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40 of the Complaint, and therefore denies the allegations in Paragraph 40.

42.     GAIC admits only that it reimbursed Boardriders for a substantial amount of expenses Boardriders allegedly incurred in connection with the cyber-attack, and that, on information and belief, no further expenses or IT Costs are covered under the Policy. GAIC lacks information or knowledge sufficient to form a belief as to the truthfulness of the remaining allegations contained in Paragraph 42 of the Complaint and, therefore, those allegations are denied.

43.     GAIC admits only that Boardriders has represented to GAIC that all but one of its systems were restored by November 20, 2019, and that all of its systems were restored by January 17, 2020. GAIC lacks information or knowledge sufficient to form a belief as to the truthfulness of the remaining allegations contained in Paragraph 43 of the Complaint and, therefore, those allegations are denied.

44.     GAIC admits only that it reimbursed Boardriders for a substantial amount of expenses and business interruption loss Boardriders allegedly incurred in connection with the cyber-attack, and that, on information and belief, no further expenses or business interruption losses are covered under the Policy. GAIC lacks information or knowledge sufficient to form a belief as to the truthfulness of the remaining allegations contained in Paragraph 44 of the Complaint and, therefore, those allegations are denied.

45.     GAIC lacks information or knowledge sufficient to form a belief as to the truthfulness of the allegations contained in Paragraph 45 of the Complaint and, therefore, the allegations are denied.

46.     GAIC lacks information or knowledge sufficient to form a belief as to the truthfulness of the allegations contained in Paragraph 46 of the Complaint and, therefore, the allegations are denied.

47.     On information and belief, GAIC admits Boardriders relayed to GAIC that Boardriders discovered a ransomware event that impacted certain of its global systems. Boardriders has not provided requested information as to the full scope and impact of the cyber-attack, and GAIC therefore lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 47 of the Complaint, and therefore denies the remaining allegations in Paragraph 47. The remaining allegations contained in Paragraph 47 of the Complaint also state a legal conclusion to which no response is required. To the extent a response is otherwise required, GAIC denies the remaining allegations contained in Paragraph 47.

48.     GAIC admits only that Boardriders has represented to GAIC that all but one of its systems were restored by November 20, 2019, and that all of its systems were restored by January 17, 2020. GAIC lacks information or knowledge sufficient to form a belief as to the truthfulness of the remaining allegations contained in Paragraph 48 of the Complaint and, therefore, those allegations are denied.

### III.    *Boardriders' Ongoing Efforts to Secure Payment from GAIC and GAIC's Unreasonable and Willful Delay*

49.     GAIC incorporates its responses to Paragraphs 1 through 48 as though fully set forth herein.

50.     The contents of the Policy and October 28, 2019 communication speak for themselves, and GAIC therefore denies the allegations in Paragraph 50 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue therein.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

51.     The contents of Willis Towers Watson's October 31, 2019 communication speak for themselves, and GAIC therefore denies the allegations in Paragraph 51 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the contents of that communication. Further, GAIC denies that SCR was its representative for purposes of post-notice claim communications.

52.     GAIC admits only that, on October 31, 2019, it advised SCR that, given the limited information available to it at that time, GAIC was not in a position to confirm coverage, and that SCR indicated to GAIC that it had conveyed this message to Boardriders. GAIC lacks knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 52 of the Complaint, and on that basis denies the allegations in Paragraph 52. Further, GAIC denies that SCR was its representative for purposes of post-notice claim communications.

53.     GAIC lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 53 of the Complaint, and on that basis denies the allegations in Paragraph 53. Further, GAIC denies that SCR was its representative for purposes of post-notice claim communications.

54.     GAIC lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 54 of the Complaint, and on that basis denies the allegations in Paragraph 54. Further, GAIC denies that SCR was its representative for purposes of post-notice claim communications.

55.     Denied.

56.     GAIC denies the allegations contained in the last sentence of Paragraph 56 of the Complaint. GAIC lacks information or knowledge sufficient to form a belief as to the truthfulness of the remaining allegations contained in Paragraph 56 and, therefore, these allegations are denied.

57.     Denied.

58.     GAIC admits only that, on April 2, 2020, SCR provided GAIC with information regarding IT-related costs purportedly prepared by Boardriders and provided to SCR on or about March 5, 2020. GAIC denies the allegations on Paragraph 58 that merely characterize the nature of Boardriders' alleged losses, and states that the loss submission and supporting materials speak for themselves. GAIC denies all remaining allegations of Paragraph 58 not admitted herein.

59.     GAIC admits only that, on April 2, 2020, GAIC was e-mailed certain documents from SCR relating to expenses purportedly incurred by Boardriders. Further responding, GAIC states that these documents were unaccompanied by the information that GAIC had requested multiple times for it to determine whether the expenses sought were covered under the Policy.  The correspondence GAIC received on or around April 2, 2020 speaks for itself, and, for these reasons, GAIC objects to the characterization of these emails as a "partial proof of loss." GAIC lacks knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 59 of the Complaint, and on that basis denies the remaining allegations in Paragraph 59.

60.     GAIC lacks knowledge or information sufficient to form a belief regarding the allegations in Paragraph 60 of the Complaint, and on that basis denies the allegations in Paragraph 60. Further, GAIC denies that SCR was its representative for purposes of post-notice claim communications.

61.     GAIC admits only that, on June 12, 2020, it received a further submission of claimed restoration and remediation expenses Boardriders asserted were covered under the Policy. The contents of the June 12, 2020 claim submission speak for themselves, and GAIC therefore denies the allegations in Paragraph 61 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the contents of that submission and communication. GAIC denies the remaining allegations contained in Paragraph 61 of the Complaint.

62.     The contents of Boardriders' June 12, 2020 submission and communication speak for themselves, and GAIC therefore denies the allegations in Paragraph 62 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the contents of that submission and communication.

## IV.    *GAIC Finally Provides a Coverage Position*

63.     GAIC incorporate its responses to Paragraphs 1 through 62 as though fully set forth herein.

64.     GAIC admits only that it issued a coverage position letter on June 26, 2020, in addition to prior coverage communications, the contents of which speak for themselves, and GAIC therefore denies the allegations in Paragraph 64 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the contents of GAIC's June 26, 2020 letter. GAIC expressly denies the second sentence in Paragraph 64 of the Complaint, other than to admit that it requested documents and information from Boardriders. The remaining allegations of Paragraph 64 are legal conclusions or arguments and require no response. To the extent a response is otherwise required, GAIC denies these allegations. GAIC expressly denies that its positions on coverage under the Policy were unreasonable, that it "quibbled" about individual expense items, and that it made incorrect statements about Policy provisions.

65.     The contents of Boardriders' July 14, 2020 communication speak for themselves, and GAIC therefore denies the allegations in Paragraph 65 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the contents of that communication.

66.     GAIC admits only that, via correspondence dated July 21, 2020, in an effort to resolve the parties' coverage disputes in good faith, it offered to make an advance payment toward Boardriders' claimed Business Interruption Loss under the Loss of Earning Extension of the Policy, made subject to review and verification by GAIC's forensic accountant MDD of the quantum and methodologies employed by

Crowe and a reservation of rights under the Policy and applicable law. The remaining allegations of Paragraph 66 of the Complaint are legal conclusions or arguments and require no response. To the extent a response is otherwise required, GAIC denies these allegations. GAIC expressly denies that it made this payment "having recognized that coverage was owed to Boardriders."

## V.    *GAIC's Continued Unreasonable Delay and Bad Faith Conduct*

67.    GAIC incorporates its responses to Paragraphs 1 through 66 as though fully set forth herein.

68.    Denied.

69.    GAIC admits only that, on September 4, 2020, in another good-faith effort to resolve the parties' coverage disputes, it wrote a letter to Boardriders, offering to make a payment toward claimed expenses and an additional advance payment toward Boardriders' claimed Business Interruption Loss under the Loss of Earning Extension of Policy, while reserving all rights under the Policy, including the right of recoupment should it be determined coverage was not available or the claimed loss of earnings amount not be substantiated. GAIC further admits that it had subsequent communications with Boardriders regarding GAIC's internal procedures for processing the payment, which was authorized on October 20, 2020. The remaining allegations in Paragraph 69 of the Complaint merely attempt to characterize the referenced communications and on this basis are denied.

70.    Denied.

71.    Denied.

72.    GAIC admits only that Boardriders, either on its own or through its forensic accountant Crowe, provided some materials and information to GAIC's forensic accountant MDD, but states that Boardriders and Crowe have never provided all of the relevant materials and information requested by GAIC. GAIC denies the remaining allegations in Paragraph 72 of the Complaint.

73.    Denied.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

74.     The contents of GAIC's December 14, 2020 email speak for themselves, and GAIC denies the allegations in Paragraph 74 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the contents of that communication. The remaining allegations of Paragraph 74 are legal conclusions or arguments and require no response. To the extent a response is otherwise required, GAIC denies these allegations. GAIC expressly denies that its December 14, 2020 email was evidence of bad faith conduct.

75.     GAIC admits only that, in another good-faith attempt to resolve the parties' coverage disputes, it offered to make another substantial payment toward Boardriders' claimed BI Loss, subject to the right to re-allocate or recoup that payment. The contents of the referenced communications speak for themselves, and GAIC therefore denies the allegations in Paragraph 75 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the contents of those communications. The remaining allegations of Paragraph 75 are legal conclusions or arguments and require no response. To the extent a response is otherwise required, GAIC denies these allegations.

## VI.     *GAIC Continues to Engage in Delay Tactics*

76.     GAIC incorporates its responses to Paragraphs 1 through 75 as though fully set forth herein.

77.     The contents of Boardriders' December 23, 2020 communication speak for themselves, and GAIC therefore denies the allegations in Paragraph 77 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the contents of that communication. The remaining allegations of Paragraph 77 are legal conclusions or arguments and require no response. To the extent a response is otherwise required, GAIC denies these allegations.

78.     GAIC admits only that, on December 23, 2020, it sent an email to Boardriders regarding MDD's questions concerning Boardriders' business interruption calculations. The contents of GAIC's December 23, 2020 email speak

for themselves, and GAIC therefore denies the allegations in Paragraph 78 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the contents of that communication. GAIC lacks information or knowledge sufficient to form a belief as to the truthfulness of the remaining allegations contained in Paragraph 78 of the Complaint and, therefore, denies same.

79.     GAIC admits that, despite its prior significant payments toward Boardriders' claimed BI Loss and IT Costs, Boardriders continued to demand additional payment from GAIC of its purported BI Loss. GAIC further admits that GAIC and Boardriders engaged in discussions regarding potential mediation. GAIC denies the remaining allegations in Paragraph 79 of the Complaint.

80.     The contents of GAIC's counsel's March 4, 2021 letter speak for themselves, and GAIC therefore denies the allegations in Paragraph 80 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the contents of that communication. The remaining allegations of Paragraph 80 are legal conclusions or arguments and require no response. To the extent a response is otherwise required, GAIC denies these allegations.

81.     GAIC admits that, on April 9, 2021, after GAIC had submitted a detailed statement in advance of a then-scheduled April 14, 2021 mediation between the parties, Boardriders asserted it needed to postpone the mediation to adjust its claim. GAIC lacks information or knowledge sufficient to form a belief as to the truthfulness of the remaining allegations contained in Paragraph 81 of the Complaint and, therefore, denies same.

82.     GAIC admits only that, on April 14, 2021, its counsel requested outstanding documents and information from Boardriders. The contents of GAIC's counsel's April 14, 2021 correspondence speak for themselves, and GAIC therefore denies the allegations in Paragraph 82 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the contents of that communication. The remaining allegations of Paragraph 82 are legal conclusions or arguments and

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

require no response. To the extent a response is otherwise required, GAIC denies these allegations. GAIC expressly denies that it failed to explain why more information was necessary to evaluate Boardriders' claim.

83. The contents of Boardriders' counsel's April 14, 2021 communications speak for themselves, and GAIC therefore denies the allegations in Paragraph 83 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the contents of those communications. The remaining allegations of Paragraph 83 are legal conclusions or arguments and require no response. To the extent a response is otherwise required, GAIC denies these allegations.

84. GAIC denies that its May 7, 2021 correspondence was "harassing." The contents of GAIC's May 7, 2021 correspondence speak for themselves, and GAIC therefore denies the allegations in Paragraph 84 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the contents of that communication. The remaining allegations of Paragraph 84 are characterizations, legal conclusions, or arguments and require no response. To the extent a response is otherwise required, GAIC denies these allegations.

## VII. *Boardriders Sends GAIC a Revised Claim*

85. GAIC incorporates its responses to Paragraphs 1 through 84 as though fully set forth herein.

86. GAIC admits only that, on May 21, 2021, Boardriders submitted a revised business interruption claim to GAIC, and Crowe sent a link to a share file site with some supporting documentation. GAIC denies the remaining allegations of Paragraph 86 of the Complaint.

87. GAIC denies that its June 11, 2011 letter was "harassing." The contents of GAIC's June 11, 2021 correspondence speak for themselves, and GAIC therefore denies the allegations in Paragraph 87 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the contents of that communication. The remaining allegations of Paragraph 87 are characterizations,

legal conclusions, or arguments and require no response. To the extent a response is otherwise required, GAIC denies these allegations.

88.     GAIC denies the allegation in Paragraph 88 of the Complaint that "all" requested data and information had been provided. The contents of Boardriders' June 11 and June 15, 2021 communications speak for themselves, and GAIC therefore denies the allegations in Paragraph 88 to the extent they are inconsistent with, misrepresent, or misconstrue the contents of those communications.

89.     Denied.

### VIII.  Compliance with All Conditions Precedent

90.     GAIC incorporates its responses to Paragraphs 1 through 89 as though fully set forth herein.

91.     Denied.

92.     GAIC admits only that Boardriders has provided some documents, including some independent forensic accounting reports and financials, purporting to support its claimed losses from the ransomware incident, but, further responding, states Boardriders has still failed to provide all requested pertinent materials and information. GAIC lacks knowledge or information sufficient to form a belief regarding the remaining allegations in Paragraph 92 of the Complaint, and on that basis denies these allegations.

93.     Denied.

94.     The allegations in Paragraph 94 of the Complaint state a legal conclusion to which no response is required. To the extent a response is otherwise required, GAIC denies the allegations in Paragraph 94.

95.     California law speaks for itself, and GAIC therefore denies the allegations in Paragraph 95 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue California law. The remaining allegations in Paragraph 95 of the Complaint state a legal conclusion to which no response is

required. To the extent a response is otherwise required, GAIC denies these allegations.

## FIRST CAUSE OF ACTION

## BREACH OF CONTRACT

96.   GAIC incorporates its responses to Paragraphs 1 through 95 as though fully set forth herein.

97.   Denied.

98.   Denied.

99.   Denied.

100.   Denied.  GAIC denies all allegations and relief sought in the wherefore/*ad damnum* clause.

## SECOND CAUSE OF ACTION

## DECLARATORY RELIEF

101.   GAIC incorporates its responses to Paragraphs 1 through 100 as though fully set forth herein.

102.   GAIC admits that an actual controversy exists between GAIC and Boardriders regarding the rights and obligations of the parties under the Policy with respect to Boardriders' claim. GAIC denies all remaining allegations of Paragraph 102 not admitted herein.

103.   GAIC admits that an actual controversy exists between GAIC and Boardriders regarding the rights and obligations of the parties under the Policy with respect to Boardriders' claim. GAIC denies all remaining allegations of Paragraph 103 not admitted herein.

104.   GAIC admits that an actual controversy exists between GAIC and Boardriders regarding the rights and obligations of the parties under the Policy with respect to Boardriders' claim. GAIC denies all remaining allegations of Paragraph 104 not admitted herein.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

105.   GAIC admits that an actual controversy exists between GAIC and Boardriders regarding the rights and obligations of the parties under the Policy with respect to Boardriders' claim. GAIC denies all remaining allegations of Paragraph 105 not admitted herein.

106.   GAIC lacks information or knowledge sufficient to form a belief as to the truthfulness of the allegations as to what Boardriders expects and, therefore, the allegations are denied. GAIC denies all remaining allegations of Paragraph 106 not admitted herein.

107.   Admitted.

108.   Admitted.

109.   Admitted.  GAIC admits only that Boardriders seeks the declarations sought in the wherefore/*ad damnum* clause. GAIC denies all remaining allegations and relief sought in the wherefore/*ad damnum* clause not admitted herein.

## THIRD CAUSE OF ACTION
## BAD FAITH

110.   GAIC incorporates its responses to Paragraphs 1 through 109 as though fully set forth herein.

111.   Denied.

112.   Denied.

113.   Denied.

114.   Denied.

115.   The Policy is a document that speaks for itself, and GAIC therefore denies the allegations in Paragraph 115 of the Complaint to the extent they are inconsistent with, misrepresent, or misconstrue the terms of the Policy. The remaining allegations of Paragraph 115 state a legal conclusion to which no response is required. To the extent that a further response is required, GAIC denies these allegations.

116.   Denied.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

117.   The allegations in Paragraph 117 of the Complaint state a legal conclusion to which no response is required. To the extent a response is otherwise required, GAIC denies the allegations in Paragraph 117.

118.   Denied.

## PLAINTIFF'S PRAYER FOR RELIEF

119.   GAIC does not believe a response is required to Boardriders' Prayer for Relief; however, to the extent a response is required, GAIC denies all allegations contained therein and denies that Boardriders is entitled to such relief. Further, GAIC will assert and will show a Jury that it is in fact GAIC who is entitled to relief, as expressed below.

## DENIAL OF MATTERS NOT SPECIFICALLY ADMITTED

GAIC denies all allegations in Boardriders' Complaint that are not admitted expressly in this Answer.

## AFFIRMATIVE DEFENSES

Great American Insurance Company ("GAIC") asserts the following affirmative defenses. In asserting these Affirmative Defenses, GAIC is not assuming any burden of proof or persuasion that would otherwise remain with Boardriders or any other party. GAIC reserves the right to amend, supplement, and revise its answers and affirmative defenses as may be determined necessary by further investigation and discovery or in accordance with any Court orders.

### FIRST AFFIRMATIVE DEFENSE

GAIC affirmatively asserts any other matter constituting avoidance or affirmative defense under applicable law not asserted below, and GAIC reserves the right to assert additional defenses that may be revealed or become applicable during further investigation and discovery in this action.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

**SECOND AFFIRMATIVE DEFENSE**

Boardriders' Complaint fails to state a claim upon which relief may be granted.

**THIRD AFFIRMATIVE DEFENSE**

Boardriders' claim may be barred or limited by the doctrines of estoppel and/or waiver.

**FOURTH AFFIRMATIVE DEFENSE**

Boardriders is not entitled to recover based on the allegations in the Complaint to the extent Boardriders' claim is barred by the defense of unclean hands.

**FIFTH AFFIRMATIVE DEFENSE**

Boardriders is not entitled to recover based on the allegations in the Complaint to the extent Boardriders' own actions or the actions of third parties were the sole cause of or contributed to Boardriders' damages, if any.

**SIXTH AFFIRMATIVE DEFENSE**

Coverage under the Policy is excluded, in whole or in part, to the extent Boardriders failed to mitigate its damages.

**SEVENTH AFFIRMATIVE DEFENSE**

Boardriders is barred from obtaining relief against GAIC because GAIC's conduct was at all times reasonable, proper, in good faith, and in compliance with applicable law.

**EIGHTH AFFIRMATIVE DEFENSE**

GAIC at no time breached any contractual or other legal duty owed to Boardriders.

**NINTH AFFIRMATIVE DEFENSE**

Coverage under the Policy is barred or limited to the extent Boardriders seeks coverage for any entity, including but not limited to Billabong, that does not qualify as an "Assured" as that term is defined in the Policy.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

**TENTH AFFIRMATIVE DEFENSE**

Coverage under the Policy is barred or limited because Boardriders has not established that every entity for which it seeks coverage, including but not limited to Billabong, qualifies as an "Assured" as that term is defined in the Policy.

**ELEVENTH AFFIRMATIVE DEFENSE**

Coverage under the Policy is barred or limited to the extent the amounts for which Boardriders seeks coverage were not sustained directly because of an "Insured Event" as that term is defined in the Policy.

**TWELFTH AFFIRMATIVE DEFENSE**

Coverage under the Policy is barred or limited to the extent Boardriders seeks coverage for amounts that do not constitute "Insured Losses" as that term is defined in the Policy.

**THIRTEENTH AFFIRMATIVE DEFENSE**

Coverage under the Policy is barred or limited to the extent Boardriders seeks coverage for amounts that do not constitute "Business Interruption Loss" as that term is defined in the Policy.

**FOURTEENTH AFFIRMATIVE DEFENSE**

Coverage under the Policy is barred or limited to the extent Boardriders seeks coverage for amounts that do not result from the necessary interruption of business caused directly and solely by an Insured Event.

**FIFTEENTH AFFIRMATIVE DEFENSE**

Coverage under the Policy is barred or limited because Boardriders has not proven that the amounts it seeks coverage for resulted from the necessary interruption of business caused directly and solely by an Insured Event.

**SIXTEENTH AFFIRMATIVE DEFENSE**

Coverage under the Policy is barred or limited to the extent Boardriders seeks Loss of Earnings falling within the Policy's Waiting Period, outside the Policy's Limits of Liability for Loss of Earnings, or incurred after the Indemnity Period.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

**SEVENTEENTH AFFIRMATIVE DEFENSE**

Coverage under the Policy is barred or limited to the extent Boardriders seeks coverage for amounts that are covered and/or owed, in whole or in part, by any other insurance policy(ies) issued to Boardriders.

**EIGHTEENTH AFFIRMATIVE DEFENSE**

Coverage under the Policy is barred or limited to the extent Boardriders failed to satisfy the condition precedent to coverage to observe and fulfill the terms and conditions of the Policy.

**NINETEENTH AFFIRMATIVE DEFENSE**

Coverage under the Policy is excluded, in whole or in part, to the extent Boardriders failed to provide GAIC with information and documents that GAIC reasonably requires to complete the adjustment of Boardriders' claims and has repeatedly requested from Boardriders.

**TWENTIETH AFFIRMATIVE DEFENSE**

Coverage under the Policy is excluded, in whole or in part, because Boardriders unreasonably delayed in providing information and documentation requested by GAIC in support of Boardriders' claimed losses.

**TWENTY-FIRST AFFIRMATIVE DEFENSE**

Boardriders' claims may be barred or limited by the doctrine of unjust enrichment.

**TWENTY-SECOND AFFIRMATIVE DEFENSE**

Boardriders is precluded by law from obtaining a windfall or "double recovery."

**TWENTY-THIRD AFFIRMATIVE DEFENSE**

Boardriders is not entitled to recover from GAIC any attorneys' fees, costs, or expenses incurred in connection with this action.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

**TWENTY-FOURTH AFFIRMATIVE DEFENSE**

Boardriders cannot meet its burden of proving any tortious breach of the implied covenant of good faith and fair dealing, much less any proper basis for punitive damages, because GAIC at all times acted reasonably in connection with the matters complained of in Boardriders' Complaint, including but not limited to reasonably assessing coverage consistent with the language of the Policy, available information, and applicable law.

**TWENTY-FIFTH AFFIRMATIVE DEFENSE**

Boardriders' prayer for punitive damages is barred because GAIC did not act with malice, oppression, or fraud in connection with the matters complained of in Boardriders' Complaint.

**TWENTY-SIXTH AFFIRMATIVE DEFENSE**

The imposition of punitive or exemplary damages against GAIC would constitute a denial of GAIC's rights under the U.S. Constitution and the California Constitution, including, but not limited to, the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Article I, Section 7 and Article IV, Section 16 of the California Constitution.

**TWENTY-SEVENTH AFFIRMATIVE DEFENSE**

Boardriders' Complaint and each purported cause of action alleged against GAIC therein is limited or barred to the extent that Boardriders failed to perform any obligation under the Policy's terms and/or all conditions precedent or subsequent to coverage have not been satisfied.

**TWENTY-EIGHTH AFFIRMATIVE DEFENSE**

Coverage under the Policy is excluded, in whole or in part, to the extent Boardriders failed to satisfy its cooperation obligations under the Policy.

**TWENTY-NINTH AFFIRMATIVE DEFENSE**

Boardriders is not entitled to recover against GAIC based on the allegations in the Complaint to the extent Boardriders failed to comply with the terms,

conditions, definitions, exclusions, and other provisions in the Policy or under applicable law.

## THIRTIETH AFFIRMATIVE DEFENSE

Boardriders' claims are barred, in whole or in part, by the common law, statutes, or insurance laws of the state whose law governs the interpretation, construction, and/or scope of the Policy.

## THIRTY-FIRST AFFIRMATIVE DEFENSE

Coverage may be barred, in whole or in part, by public policy.

WHEREFORE, GAIC prays for judgment as follows:

1.     That Boardriders' Complaint be dismissed in its entirety with prejudice;

2.     That judgment be entered against Boardriders and in favor of GAIC;

3.     That GAIC recover its costs, including reasonable attorneys' fees; and

4.     That the Court award GAIC any other further relief deemed appropriate.

## COUNTERCLAIMS AGAINST PLAINTIFF/COUNTER-DEFENDANT BOARDRIDERS, INC.

Defendant/Counter-Plaintiff Great American Insurance Company ("GAIC"), by and through its undersigned counsel, asserts the following Counterclaims against Plaintiff/Counter-Defendant Boardriders, Inc. ("Boardriders") and in support thereof, is informed and believes and therefore alleges as follows:

## INTRODUCTION/NATURE OF THE ACTION

1.     GAIC seeks a declaration concerning the rights and obligations of the parties under an insurance policy GAIC issued to Quiksilver, Inc., n/k/a Boardriders, Inc. ("Boardriders"), for the January 15, 2017 to January 15, 2020 policy period (the "Policy"), in connection with an October 2019 cyber-attack for

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

which Boardriders seeks coverage and GAIC has made substantial payments under the Policy (the "Cyber Incident").

2.      Specifically, GAIC seeks a declaration that it owes no further payments to Boardriders, and in fact a significant portion of payments it made to Boardriders in connection with Boardriders' claim for Business Interruption Loss ("BI Loss") arising from the Cyber Incident were not covered under the Policy, such that GAIC is entitled to reimbursement of those amounts from Boardriders.

3.      As discussed further below, Boardriders seeks coverage under the Policy for, among other things, BI Loss it claims to have sustained after the Cyber Incident shut down several of its computer systems worldwide. Despite not having sufficient information regarding the nature and extent of Boardriders' claimed losses, in a good faith effort to resolve the parties' coverage dispute and assist Boardriders' recovery efforts, GAIC advanced millions of dollars to Boardriders for its claimed BI Loss, while expressly reserving the right to seek recoupment of same in the event GAIC determined such amounts were not covered under the Policy or otherwise not supported by Boardriders.

4.      Since making these substantial payments, GAIC has determined, based on the data eventually provided by Boardriders, that Boardriders has failed to demonstrate that a significant portion of its claimed BI Loss for which GAIC paid was "caused directly and solely by" the Cyber Event, as required to trigger Loss of Earnings coverage under the Policy.  Boardriders instead has sought to recover every dollar of less-than-expected sales in the months following the Cyber Incident, without even attempting to demonstrate how those losses were "caused directly and solely by" the Cyber Incident.

5.      Rather than support its millions of dollars of claimed BI Loss, or attempt to demonstrate how GAIC did not greatly overpay for uncovered amounts, Boardriders instead makes unfounded allegations that GAIC has handled this claim in bad faith, notwithstanding the millions of dollars of payments made by GAIC out

of an abundance of *good faith* and even in the face of insufficient information supporting Boardriders' purported losses.

6.     Boardriders also has never satisfied the Policy's condition precedent to coverage of demonstrating that Billabong, which Boardriders acquired after GAIC issued the Policy, qualifies as an "Assured" under the Policy.

7.     GAIC is thus entitled to recover the significant uncovered sums it previously paid to Boardriders, as demonstrated herein.

## THE PARTIES

8.     GAIC is an Ohio corporation with its principal place of business in Cincinnati, Ohio. GAIC is an authorized insurer in the State of California, licensed to sell insurance in the State of California, and regularly solicits and conducts business in the State of California.

9.     Boardriders is a California corporation with its principal place of business in Huntington Beach, California. Boardriders is licensed to do business, and is transacting business, in the state of California.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. There is complete diversity between parties, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

11.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims at issue occurred in this District. Additionally, Boardriders resides in this District, and thus venue is also proper under 28 U.S.C. § 1391(b)(1).

## FACTUAL BACKGROUND

### A. The Cyber Incident

12.     According to information relayed by Boardriders, on or around October 24, 2019, Boardriders discovered that its computer systems had been encrypted due to a ransomware attack.

13.     During the course of its investigation, Boardriders reportedly discovered a message demanding 2,600 bitcoin (approximately $25 million at the time) in exchange for decryption keys. As soon as it received the demand, however, Boardriders decided it would not pay the ransom.

14.     Boardriders retained a security consultant, Flashpoint, to engage with the perpetrators. Shortly after Flashpoint reached out to the attacker to find out the amount of the demand on or around October 26, 2019, Boardriders had no further communications with the attacker, made no attempt to reach out again, and did not pay the ransom. Boardriders was advised by the Department of Homeland Security, the FBI, and Flashpoint not to try to communicate further with the attacker.

15.     As a result of the Cyber Incident, Boardriders alleges that it sustained substantial losses, including millions of dollars in BI Loss for the "Legacy Billabong" division of the companmillions of dollars in BI Loss for the "Legacy Boardriders" division of the company; and millions of dollars in fees and expenses of Boardriders' retained security and information technology consultants and vendors and other related "Additional Expenses" arising out of the Cyber Incident (the "IT Costs").[1]

**B.     The Policy**

16.     GAIC issued Policy No. OY70254CR, to Quicksilver, Inc.[2] for the policy period of January 15, 2017 to January 15, 2020 (the "Policy"). GAIC incorporates the Policy by reference and *in haec verba*.[3]

---

[1] Although this Counterclaim seeks reimbursement from Boardriders only with respect to GAIC's payments of Boardriders' BI Loss, GAIC reserves the right to amend its Counterclaim to seek reimbursement from Boardriders with respect to its payments of Boardriders' IT Costs.

[2] In late March 2017, Quicksilver, Inc. announced that it had changed its corporate name to Boardriders, Inc. *See* "Quicksilver, Inc. Renamed Boardriders, Inc.," Business Wide, available at https://www.businesswire.com/news/home/20170308005984/en/Quiksilver-Inc.-Renamed-Boardriders-Inc.

[3] The Policy includes as a Condition that the Assured "must at all times use best efforts to ensure that knowledge of the existence of this insurance is restricted as far as possible" (Policy § 3.3). In

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

17.     As relevant here, subject to its terms and conditions, the Policy provides that GAIC "agree[s] to indemnify the **Assured**[4] in respect of Insured Losses sustained because of **Insured Events** which occur during the Period of Insurance – all as defined in this Policy." (Policy, Preamble).

18.     In pertinent part, the Policy provides limits of (a) $10,000,000 for "Additional Expenses" per **Insured Event**, and (b) $10,000,000 for "Business Interruption Loss" per **Insured Event** under a Loss of Earnings Extension, subject to a waiting period of 6 hours and an indemnity period of no more than 120 days, and other limitations on its scope of application. (Policy, Loss of Earnings Extension Endorsement).

19.     The applicable **Insured Event** for the Cyber Incident is an **Extortion**, which is defined as:

[T]he making of illegal threats either directly or indirectly to the **Assured** or to an **Insured Person** to:

(i)     kill, injure, abduct an Insured Person; or

(ii)    cause physical damage or loss to Property; or

(iii)   disseminate, divulge or utilise Trade Secrets or proprietary information including any personal, private or confidential data;

(iv)    introduce any virus, worm, logic bomb or Trojan Horse into the **Assured's** computer systems which indiscriminately replicates itself and automatically disseminates itself causing damage, destruction, erasure, alteration or corruption of computerised data.

---

addition, public knowledge of the Policy could be dangerous for the Assured and its employees. For these reasons, GAIC has not attached a copy of the Policy to the Counterclaim, but incorporates the Policy by reference. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim."); *Columbia Cas. Co. v. Cottage Health Sys.*, No. CV1503432 DDP (AGRx), 2015 WL 4497730, at *2 (C.D. Cal. July 17, 2015) ("[T]he complaint fundamentally relies on the policy, and it may therefore be incorporated into the complaint by reference.").

[4] Terms in bold are defined in the Policy.

- 28 -

by persons who then demand a **Ransom** as a condition of not carrying out some threats.

(Policy, Section 1.3, as amended by Enhanced GAIC SCR Amendatory Endorsement).

20.     The Policy enumerates categories of **Insured Losses** that are covered by the Policy in Section 2, **Insured Losses**, which include "Additional expenses, being expenses necessarily incurred following, and for the duration of, an **Insured Event** by the **Assured** or an **Insured Person(s)**." (Policy, Section 2).

21.     The Policy also contains a Loss of Earnings Extension, which provides, in relevant part:

> Business Interruption Loss suffered by the Insured resulting from the necessary interruption of business caused directly and solely by . . . Extortion . . . The maximum Limit of Liability for all Business Interruption Loss will not exceed the limit stated in the schedule.
>
> * * *
>
> "Business Interruption Loss" means the loss of Earnings, but not exceeding the actual reduction in Earnings, less charges and expenses which do not necessarily continue during the interruption of business, resulting from necessary interruption of business caused directly and solely by an Insured Event.

(Policy, Loss of Earnings Extension).

22.     In other words, the coverage provided by the Policy for BI Loss is limited to that amount which is "caused directly and solely" by the **Extortion**. A loss in sales or profits is not a covered Business Interruption Loss unless it is demonstrated to have been caused directly and solely by the **Extortion**.

23.     Finally, the Policy provides that the "**Assured**" shall be automatically amended to include any newly acquired subsidiary on the following pertinent basis: "any newly acquired subsidiary whose market value at the date of acquisition is less than 25% of the **Assured**'s market value is automatically covered for the remainder of the policy period, provided that with respect to the new acquisition there are no threats or incidents ongoing at the time of acquisition."

Troutman Pepper Hamilton Sanders LLP
5 Park Plaza
Suite 1400
Irvine, CA 92614-2545

(Policy Condition 3.11, as amended by Enhanced GAIC SCR Amendatory Endorsement).

C.  **Boardriders Gives Notice of the Cyber Incident and Ensuing Communications Between Boardriders and GAIC**

24.  Boardriders initially provided notice of the ransomware attack to its cyber insurer, AIG, on October 24, 2019. In consultation with AIG, Boardriders retained breach counsel (which later became its coverage counsel); Flashpoint for the initial contact with the attackers; and, ultimately, other vendors.

25.  On or around October 28, 2019, Boardriders, through Specialty Contingency Risks, Inc. ("SCR," the wholesale broker), provided notification of the Cyber Incident to GAIC. Very few details were provided initially.

26.  GAIC advised Boardriders through SCR that Boardriders should contact Control Risks Group ("Control Risks"), the Security Consultant designated in the Policy to provide services and receive notice.

27.  On October 31, 2019, Boardriders contacted Control Risks. By that time, Boardriders had already retained other vendors to assist it, and thus Control Risks' services were not needed.

28.  As of October 31, 2019, GAIC's knowledge of the Cyber Incident was limited to the 2-3 sentence summary it had received from Boardriders just three days earlier, which, among other things, did not identify when the purported attack had occurred or when it was discovered, and gave no details about the ransom demand. Based on the scant information provided, GAIC was not in a position to make a coverage determination, and it immediately advised Boardriders of that fact through SCR. GAIC also advised that it does not provide advice or approval regarding negotiation or payment of ransom demands; those matters are decisions for Boardriders.

29.  There followed months of communications, in which GAIC requested details of the Cyber Incident and losses claimed so that it could make a

coverage determination on the loss items claimed. From October 2019 until June 2020, GAIC communicated with Boardriders through SCR.

30.     For months after the attack, GAIC was provided scant information about the event, even though GAIC made repeated requests for information about the event and costs incurred, so it could make a coverage determination. It took Boardriders over two months to provide basic factual information, such as copies of communications with the attacker and legal authorities and limited forensic findings concerning the Cyber Incident, and many more months to provide information such as an overall timeline of the event and identification and documentation of expenses claimed.

31.     To date, Boardriders has not provided any forensic report, despite GAIC reimbursing it for significant sums incurred by cybersecurity vendors which undertook forensic analyses, or many of the explanations requested as to expenses and losses claimed.

32.     GAIC received the first details of loss in early April 2020, which information was limited to expenses only, not BI Loss. It was obviously incomplete, and was forwarded to GAIC by SCR along with an explanation that clearly came directly from Boardriders:

> The Assured is still reconciling all of the invoices that have been paid and will update the file with that information in the coming weeks.

> The Assured reserves all rights to supplement this proof of loss once additional costs or expenses become known and/or invoiced. The Assured is also working on calculating additional business interruption losses and reserves the right to submit a separate proof of loss and supporting documentation for same once that analysis has been finalized.

Although Boardriders contends it submitted its expenses in March 2020 (pointing to when it sent the information to SCR, rather than when SCR forwarded it to GAIC), it is clear that regardless of the exact date of transmission, the submission was incomplete. And it did not include an additional $1.1 million in expenses claimed for the first time by Boardriders in June 2020.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

33.     Not only was the March/April 2020 submission incomplete, the documentation provided to GAIC was a morass. Several of the invoices provided were in foreign languages, with no translations provided. Other invoices were for items plainly not covered by the Policy, such as year(s)-long service contracts and purchases of new computers. GAIC's prior request that expense information include details such as the vendors' role and a description of when and why each cost was incurred was ignored. Without this information, it was impossible for GAIC to determine whether the expenses fell within one or more of the categories of covered Insured Losses under the Policy.

34.     GAIC did its utmost to review and assess the information provided on expenses, and again explain why the details it had requested were important. On May 10, 2020, GAIC sent a lengthy review of the information provided to Boardriders, via SCR, reminding Boardriders that GAIC was "still waiting for responses to very specific questions" set forth in prior correspondence, which it needed "to perform a proper coverage analysis." GAIC set forth its "understanding of the facts of the loss" based on the limited information to date, and reminded Boardriders that the Policy is intended to "deal with a crisis, i.e., the Extortion itself" and "does not provide coverage for the wider losses after the Extortion has passed." GAIC also inventoried some of the many issues with the invoices submitted for reimbursement.

**D.     Boardriders Engages Coverage Counsel and Eventually Submits a BI Loss Claim, for Which GAIC Issued a Coverage Opinion and Made Substantial Payments**

35.     On June 12, 2020, GAIC learned Boardriders had retained coverage counsel, which submitted a multi-million-dollar BI Loss claim on behalf of Boardriders – for the first time, eight months after the Cyber Incident, and an additional $1.1 million in newly claimed IT Costs.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

36.     Despite having just submitted nearly $6 million in new expenses and BI Loss, Boardriders' June 12, 2020 letter demanded payment in full. It also advised that the BI Loss submission was just for losses for the Legacy Billabong division of Boardriders, and that an additional BI Loss claim for Legacy Boardriders BI Loss (totaling over $5 million) had been submitted to AIG under AIG's cyber policies.

37.     The June 12, 2020 letter was also filled with unfounded accusations of bad faith, alleging delays in GAIC's investigation of the matter and provision of a coverage position, despite the fact that over $5 million in losses had just been submitted and Boardriders had been made aware of GAIC's requests for outstanding information.

38.     The letter also revealed for the first time that there had been issues with the chain of communications that had gone through SCR, the wholesale broker. Once made aware of those issues, GAIC welcomed the opportunity to communicate directly with Boardriders and its counsel to avoid any confusion created by going through brokers, to clear up any past misunderstanding and avoid further ones, and to obtain the outstanding information it needed to complete its coverage evaluation and resolve this claim.

39.     Within two weeks, on June 26, 2020, GAIC responded directly to Boardriders and its coverage counsel. Among other things, GAIC reiterated outstanding requests and missing information and expressed GAIC's desire to work with Boardriders, cooperatively and directly, to obtain the information needed to fully evaluate and resolve this matter. In light of the new BI Loss submission, GAIC indicated it would be appointing a forensic accountant, and suggested that, once that forensic accountant was in place, there be direct communication between GAIC's accountant and Boardriders' accountant (Crowe). GAIC also took the opportunity to further identify coverage issues, including whether the Billabong entity satisfied the definition of a newly acquired entity that would qualify as an

"Assured" under the Policy; the limited scope of coverage for expenses under the terms of the Policy; and the potential impact of other insurance identified. GAIC shortly thereafter retained MDD as its forensic accountant.

40.     Following the June 2020 exchange, there ensued a series of letters over the next few months, with Boardriders doubling-down on its position that further information was unnecessary, and repeatedly threatening to file suit against GAIC and asserting bad faith if payment in full was not immediately made on the complex BI Loss Boardriders had just submitted.

41.     This was an unusually complicated BI Loss claim involving multiple divisions of Boardriders, worldwide operations, and multiple channels of distribution (wholesale, retail, e-commerce). Boardriders was also demanding payment of expenses that clearly fell outside the limited scope of coverage of the Policy – and within the scope of the AIG cyber policies.

42.     Although Boardriders had taken months to prepare its BI Loss analysis, and of course had full access to its own financial data, it repeatedly and vigorously resisted GAIC's requests for information to support the losses claimed and the assumptions on which its claim was based. Much of the information requested by GAIC and its forensic accountant, MDD, to vet the full amount of the claim and test the assumptions on which it is based still remain outstanding to this day.

43.     Nevertheless, wishing to confirm its good faith and identify items on which payments could be made so as to narrow the issues in dispute and ideally avoid a dispute entirely, and in recognition that a lawsuit was more likely to slow down than expedite the process of getting all the information needed to substantiate and resolve the entire claim, GAIC proposed – and Boardriders accepted – that GAIC make an "advance payment," subject to mutual continuing reservations of rights. The rights reserved by GAIC included the right to reallocate the payment to specific losses determined to be covered, and to pursue claims against any other

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

insurer that was also responsible for the losses in issue. Under these terms, GAIC agreed to make an advance payment of $2 million in July 2020, and agreed to an additional $500,000 in early September 2020, toward the Legacy Billabong BI Loss submitted to it, plus an additional payment of $175,542.26 for IT Costs.

44. On December 23, 2020, GAIC made a further payment of $3.1 million toward Legacy Boardriders BI Loss. This payment was made subject to a reservation of rights that included the right to recoup that payment should outstanding information not confirm that amount as due and covered.

45. All told, GAIC has paid $5.6 million of Boardriders' claimed BI Loss and $175,542.26 of Boardriders' claimed IT Costs.

**E.    Boardriders Has Failed to Demonstrate its BI Loss is Covered**

46. Despite GAIC's $5.6 million in payments toward Boardriders' claimed BI Loss, Boardriders continues to seek millions of dollars in additional BI Loss from GAIC (and AIG, which has on information and belief made no payment toward Boardriders' BI Loss to date).

47. While still seeking reimbursement from GAIC, Boardriders was slow to provide data and information GAIC repeatedly indicated was necessary to evaluate Boardriders' claim. The information requested by GAIC included, but was not limited to:

a) Data supporting Boardriders' assertion that Billabong qualifies as an **Assured** under the Policy;

b) Boardriders' communications with AIG regarding loss submissions and coverage under AIG's cyber policies;

c) Forensic findings of Boardriders' cybersecurity consultants;

d) Financial documents, budgets, and other forensic data identified by GAIC's forensic accountant MDD;

e) Information regarding the timeline of the Cyber Incident and Boardriders' restoration of its systems;

f) Sales data by region and distribution channel;

g) Identification of retail locations purportedly impacted by the Cyber Incident;

h) Data and information provided to AIG's forensic accountant that was not provided to GAIC's;

i) Numerous explanations for assumptions set forth in Boardriders' loss submissions; and

j) Evidence demonstrating its claimed BI Loss was caused directly and solely by the Cyber Incident.

48.     On May 21, 2021, while much of the information requested by GAIC was still outstanding, Boardriders submitted a revised BI Loss claim, increasing its total claimed business interruption losses by over $1.4 million. Although Boardriders' May 21 submission included source materials and some of the data requested by GAIC, much of the material requested by GAIC, including sales data MDD had determined was necessary in order to fully and fairly evaluate Boardriders' claim, was still not provided.

49.     GAIC did not receive data sufficient to evaluate Boardriders' claim until June 17, 2021, and in fact still has not received all of the requested information.

50.     Indeed, as GAIC explained in correspondence to Boardriders issued on September 24, 2021, Boardriders has yet to provide GAIC with all materials and information necessary to substantiate Boardriders' claimed BI Loss, which GAIC has repeatedly requested from Boardriders.

51.     Nevertheless, based on the materials received, GAIC has determined that Boardriders used this Claim to try to recover every single dollar of shortfall from its earnings projections, without even attempting to show that any of the shortfall was "caused directly and solely by" the Cyber Incident – as required by

the Policy – and without taking into account any amounts earned above anticipated sales.

52.     Boardriders has not demonstrated the requisite causation between the Cyber Incident and its alleged losses and, when considering the numerous factors underlying the data and forces in the market at the time of the Cyber Incident, Boardriders cannot do so.

53.     Rather than tie its lower-than-expected revenues within certain regions and channels to the Cyber Incident,[5] Boardriders instead bases its claim for lost business interruption on a purely mathematical equation of simply deducting actual sales from anticipated sales and projected budgets, without demonstrating any direct causation or link to the Cyber Incident.

54.     Boardriders' failures to establish direct causation between its claimed business interruption losses and the Cyber Incident include, but are not limited to:

a)  Claiming revenue shortfalls that continue well beyond the dates Boardriders' systems were restored to operations, without any demonstration that such losses were due to the Cyber Incident.

b)  Failing to consider or acknowledge that there was any potential makeup of claimed lost sales by any other channels or locations – *e.g.*, failing to consider whether any sale that could not be conducted in one retail location could have been diverted to another location or platform.

c)  Failing to take into account the possibility that marketing campaigns or discount incentives skewed its year-to year comparisons.

d)  Refusing to provide detailed sales data for Legacy Billabong brands and stores prior to August 2018. Although Boardriders has asserted that the customary two-year history of prior sales was not relevant as to Legacy

---

[5] Boardriders organizes its financial reporting by three revenue streams, or "channels" – Retail, Wholesale, and Ecommerce, grouped into three major geographic regions – AMS (North, South, and Central America), EMEA (Europe, Middle East, and Africa), and APAC (Asia-Pacific, including Australia and New Zealand).

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

Billabong because sales prior to August 2018 do not reflect growth the company management at the time believed would be achieved following the reorganization of Boardriders, Boardriders did not provide evidence demonstrating that reorganizational changes after its acquisition of Billabong had been implemented, or, if implemented, had been effective.

e) Failing to provide information repeatedly requested by GAIC to allow GAIC to determine whether the Billabong subsidiary that purportedly sustained a substantial portion of alleged BI Loss qualifies as an "Assured" under the Policy.

55.    GAIC, through publicly available sources, has also identified several external/market forces present in the fall and winter of 2019, including at or near locations Boardriders claimed suffered significant losses compared to other claimed locations, that plainly would have contributed to many of the losses claimed by Boardriders and are wholly divorced from the Cyber Incident. However, if a store or channel had a reduction in sales from projections, all such shortfall was included in Boardriders' claimed BI Loss, without taking into account any other factor(s). By way of example only:

a) During the time period in issue, there was a decline in brick-and-mortar shopping due to the continuing rise in popularity of online shopping as an alternative – specifically, according to U.S. Census data, as a percentage of total retail sales, e-commerce sales rose from 11.4% in Q4 2019 to 15.66% in Q4 2020.[6]

b) The rate of growth of global retail sales experienced a "marked decline" in 2019 from the five preceding years – reflecting "growing economic

---

[6] *See* http://www.census.gov/estats.

uncertainty and a dampening economic environment across many corners of the globe."[7]

c) Boardriders and Billabong were both impacted in 2019 by tariffs placed by the Trump Administration on imported Chinese goods, particularly coming out of the company restructuring in 2018.

d) Boardriders' Chief Executive, David Tanner, wrote a letter to the office of the U.S. Trade Representative in June of 2019, noting Boardriders would be particularly hurt by the tariffs, especially considering the company recently emerged from bankruptcy and restructuring. In the letter, Mr. Tanner stated: "The detrimental impact of the proposed measures would undermine the significant efforts that Boardriders has put into cutting costs, enhancing growth, and bringing jobs into the United States."[8]

e) Mr. Tanner also testified in a hearing before the U.S. Trade Representative on June 24, 2019,[9] noting China is the "predominant supplier of [Boardriders'] apparel, footwear, and accessory products in the United States," and further stating, among other things:

> "Imposing additional duties on these products would be particularly harmful to Boardriders. In the past three years, our company has emerged from bankruptcy, significantly structured by reducing costs and streamlining the company and has consolidated our industry through an acquisition. Through these painstaking efforts, Boardriders has just recently begun to regain full financial

---

[7] *See* "Ecommerce Continues Strong Gains Amid Global Economic Uncertainty," Insider Intelligence, June 27, 2019, https://www.emarketer.com/content/global-ecommerce-2019.

[8] *See* "Local Retailers Take on Tariffs," Los Angeles Business Journal, June 21, 2019, https://labusinessjournal.com/news/2019/jun/21/local-retailers-take-tariffs/.

[9] *See* Exhibit 1, U.S. Trade Representative 301 Committee, Section 301 Tariffs Public Hearing, June 24, 2019 (excerpted).

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

stability and is now working to develop additional growth and employment opportunities domestically. Additional duties on Boardriders' products at this delicate time would cause a drastic reduction in earnings that could cause the company to breach its loan covenants and threaten its ability to make debt repayments."

"Boardriders has already had to increase prices due to the 25 percent tariffs on List 3 products as well as in anticipation of additional tariffs on List 4 products."

"The additional tariffs and subsequent price increases will threaten the long-term profitability and viability of these American businesses and directly impact U.S. consumers that frequent them."

f) The above tariffs were enacted on August 20, 2019,[10] and U.S. companies continue to feel the effects of the tariffs.[11]

g) Billabong was still adjusting to its acquisition by Boardriders in April of 2018. For instance, the integration of Billabong into Boardriders in Europe took longer than in other parts of the world, with the bulk of the integration taking place in the second half of 2019, and resulting in the elimination of 170 positions.[12] In addition, Billabong and Boardriders accrued significant debt to keep afloat after the acquisition, which eventually forced the sale of

---

[10] *See* Exhibit 2, Federal Register, Vol. 84, No. 161, August 20, 2019.

[11] *See* "U.S. companies are bearing the brunt of Trump's China tariffs, says Moody's," CNBC, May 18, 2021, https://www.cnbc.com/2021/05/18/us-companies-bearing-the-brunt-of-trumps-china-tariffs-says-moodys.html (noting most of the elevated tariffs imposed at the height of the U.S.-China trade war have remained in place and affect over half of all trade flows between the two countries, with U.S. importers absorbing more than 90% of additional costs resulting from the tariff on Chinese goods).

[12] *See* "Boardriders Changes Leadership in Europe," Shop-Eat-Surf, April 8, 2019, https://shop-eat-surf.com/2019/04/boardriders-changes-leadership-in-europe/.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA  92614-2545

Billabong's headquarters in Australia, to then be leased back to the company.[13] Billabong also underwent at least two series of layoffs and closed some facilities as part of the post-acquisition consolidation.[14]

h) By the end of 2019, and into January of 2020 (for which month Boardriders' revised BI Loss claim in May of 2021 added significant claimed losses in Europe) worldwide markets, especially in Asia and Europe, were experiencing losses due to fears of a COVID-19 global outbreak.[15]

i) Several of the retail locations claimed by Boardriders as seeing relatively larger losses are in or near locations that experienced significant weather events, natural catastrophes, and social/political unrest during the same time frame as the loss period claimed by Boardriders. For instance:

j) Uncontrolled, "devastating," record-breaking wildfires burned for months on end and into January 2020 throughout most of Australia, with significant impacts in New South Wales and Queensland, where multiple stores claimed by Boardriders are located. Impacts included government declared states-of-emergency, emergency evacuations, stay-at-home orders (due to

---

[13] *See* "Major Burleigh Heads Site Hits the Block," The Urban Developer, November 8, 2018, https://www.theurbandeveloper.com/articles/major-burleigh-heads-asset-hits-market-for-up-to-50m.

[14] *See* "Boardriders to Lay off 40 People in Orange County, Calif.," Apparel News, May 23, 2019, https://www.apparelnews.net/news/2019/may/23/boardriders-lay-40-people-orange-county-calif/.

[15] *See, e.g.*, Exhibit 3 (collection of articles): "European shares dip as Chinese coronavirus concerns deepen; Sars-like virus scares investors as millions start travelling for Chinese new year celebrations," The Guardian (London), January 21, 2020; "Markets on the slide as fears spread over virus; Interest rate talk piles pressure on Wall Street; Markets hit by virus fears," The Times (London), January 28, 202); "Eurozone growth slows sharply as French and Italian economies shrink," The Guardian (London), January 31, 2020; "Markets in turmoil after coronavirus stokes fears over growth," The Times (London), January 31, 2020.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

poor air quality), and road and airport closures, as well as dozens of lives lost and thousands of properties destroyed.[16]

k) Most of Japan was impacted by Typhoon Hagibis in October of 2019, one of the most powerful and deadly in decades, which claimed at least 80 lives, forced tens of thousands of people into emergency shelters, caused hundreds of thousands of homes to lose power and water, damaged at least 10,000 homes, caused major travel and public transportation disruptions, created extensive landslides that blocked roads and isolated entire communities, closed hundreds of schools and convenience stores, and was expected to have long-lasting effects on the country's economic activities.[17]

l) Southern France experienced major flooding in November of 2019 that collapsed roads, trapped travelers, caused mudslides and downed trees, and killed at least three people.[18]

---

[16] *See, e.g.*, "Australia Wildfires: State of Emergency Declared Over 'Catastrophic' Danger," NPR, November 11, 2019, https://www.npr.org/2019/11/11/778271273/australia-wildfires-state-of-emergency-declared-over-catastrophic-danger; "Emergency declared as bushfire rages on central Queensland coast," Brisbane Times, December 17, 2019, https://www.brisbanetimes.com/au/national/queensland/emergency-declared-as-bushfire-rages-on-central-queensland-coast-20191217-p53knn.html; "How Australia's bushfires spread: mapping the east coast fires," The Guardian, January 10, 2020, https://www.theguardian.com/news/datablog/2019/nov/21/how-australias-bushfires-spread-mapping-the-nsw-and-queensland-fires; "Australia fires: A visual guide to the bushfire crisis," BBC, January 31, 2020, https://www.bbc.com/news/world-australia-50951043.

[17] *See, e.g.*, "Recovery begins as Japan's Typhoon Hagibis leaves trail of death and destruction," CNN, October 13, 2019, https://www.cnn.com/2019/10/13/asia/typhoon-hagibis-japan-rugby-intl-hnk/index.html; "Japan's Prime Minister Wars Of 'Prolonged' Effects of Typhoon Hagibis' Destruction," NPR, October 15, 2019, https://www.npr.org/2019/10/15/770224030/japan-draws-on-emergecy-fund-to-pay-for-aftermath-of-typhoon; "Japan Gears Up for Long-Lasting Effects of Typhoon Hagibis, As Death Toll Rises to 74," Japan Forward, October 15, 2019, https://japan-forward.com/japan-gears-up-for-long-lasting-effects-of-typhoon-hagibis-as-death-toll-rises-to-74; "Deadly typhoon forces Japan to face its vulnerability to increasingly powerful storms," Science Mag, October 22, 2019, https://www.sciencemag.org/news/2019/10/deadly-typhoon-forces-japan-face-its-vulnerability-increasingly-powerful-storms.

[18] *See* "3 dead, highway collapses as floods pound France, Italy," Associated Press, November 24, 2019, https://apnews.com/article/a31fe70c510f44cb9792fdb394b8b027.

m) In November of 2019, massive climate change strikes and demonstrations took place throughout the world, including Spain, England, Switzerland, and Australia, with estimated participants in the hundreds of thousands.[19] Over 500,000 people participated in a climate strike in Madrid on December 6, 2019, which was "one of hundreds of climate strikes around the world this and last Friday."[20]

n) Nationwide union worker strikes across France in early December 2019 shut down cities all over the country over pension reform plans, which included closing most of the light rail lines in Paris, canceling 20% of flights going in and out of larger cities, and hundreds of thousands of demonstrators in about 40 cities. Demonstrations and severe disruptions were expected to last several days.[21]

56.     In sum, there are a host of factors that plainly contributed to Boardriders' less-than-expected sales across various channels and regions. It is Boardriders' obligation, which it has not even attempted to fulfill, to prove that its claimed losses were instead caused directly and solely by the Cyber Incident.

57.     In addition to failing to prove its claimed losses were directly caused by the Cyber Incident, or to consider external factors that contributed to its losses, Boardriders' presentation of its claimed BI Loss and the assumptions underlying it

---

[19] *See* "Hundreds of thousands of students join global climate strikes," The Guardian, November 29, 2019, https://www.theguardian.com/environment/2019/nov/29/hundreds-of-thousands-of-students-join-climate-strikes); "Switzerland: Tens of thousands join climate march ahead of election," Deutsche Welle, November 28, 2019, https://www.dw.com/en/switzerland-tens-of-thousands-join-climate-march-ahead-of-election/a-50626988.

[20] *See* "Half a Million March in Madrid to Bring Climate Strikes to the COP," Climate Action Network International, December 7, 2019, https://climatenetwork.org/2019/12/07/half-a-million-march-in-madrid-to-bring-climate-strikes-to-the-cop/.

[21] *See* "National Strike in France Shuts Down Cities Over Macron's Pension Reform Plans," NPR, December 5, 2019, https://www.npr.org/2019/12/05/785018695/national-strike-in-france-shuts-down-cities-over-macrons-pension-reform-plans).

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

have additional, substantial analytical flaws. Just an example of the several methodological weaknesses in Boardriders' analysis that have been identified by GAIC include, but are not limited to:

- Selecting only some locations or revenue streams within a geographic region to include in the claim without identifying why it did not include all locations, despite the fact that, in a typical business interruption loss due to a cyber-attack, retail locations within the same region or country on the same computer system should have all been impacted or not impacted. If there truly were non-impacted locations or portions of channels, then those not impacted would likely have an increase in revenue from sales diverted from locations and channels that were impacted to those that could process them.

- Relying on limited short time periods to determine trends used in projecting expected revenue and loss, which may not be reflective of the expected sales. For instance, the limited evidence of longer time periods provided for some of the channels shows sales actually varied significantly from month to month, and projections based on short time periods are not reliable indicators of long-term performance.

- Claiming shortfalls in revenue that do not have the typical trends and patterns that losses incurred by cyber events typically exhibit.

- Claiming as loss due to the Cyber Incident even small reductions in anticipated revenue that fall within a standard deviation of normal fluctuation, including claiming the equivalent of one lost sale as being Incident-related.

- Increasing its claim significantly by extending its claimed retail losses in the EMEA region through January 31, 2020, and adding some retail locations not previously claimed and removing others, 18 months after the Cyber Incident and 11 months after its initial claim submission and

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

multiple calls between Crowe and MDD; however, it has not provided any explanation or documentation as to why the loss was extended and claimed retail locations changed, rendering the changes likely to be part of an effort to move all shortfalls in projected performance to the Claim.

- For Ecommerce in the AMS region, Boardriders switched midperiod the grounds on which it based its claimed shortfall; for October 2019 it used a 2.5-month trend of sales, and then for November 2019 onward started to compare sales to budgeted amounts that significantly increased the expected revenues and thus made it appear Boardriders suffered a loss that would not have otherwise been shown.

58.     These and other flaws in the assumptions and methodologies used by Boardriders in calculating its claimed BI Loss demonstrate that Boardriders has failed in its presentation of its claim to meet its burden of proving its losses are covered by the Policy – *i.e.*, that they are a "loss of Earnings . . . resulting from necessary interruption of business caused directly and solely by an Insured Event."

## COUNT I

### (Declaratory Relief – No Business Interruption Loss)

59.     GAIC re-alleges each and every allegation contained in Paragraphs 1 through 58 as though fully set forth herein.

60.     Subject to its terms and conditions, the Policy provides coverage for Business Interruption Loss suffered by the Insured resulting from the necessary interruption of business caused directly and solely by, among other things, Extortion. The maximum Limit of Liability for all Business Interruption Loss will not exceed the limit stated in the schedule. "Business Interruption Loss" means the loss of Earnings, but not exceeding the actual reduction in Earnings, less charges and expenses which do not necessarily continue during the interruption of business, resulting from necessary interruption of business caused directly and solely by an Insured Event. (Policy, Loss of Earnings Extension).

61.     As the Insured, it is Boardriders' burden to prove its claimed losses are covered by the Policy.

62.     Yet Boardriders has not even attempted to show how, or even whether, its claimed "loss of Earnings . . . result[ed] from necessary interruption of business caused directly and solely by" the Cyber Incident.

63.     Boardriders has not demonstrated a direct causal connection between its claimed BI Loss and the Cyber Incident, as required by the Policy and applicable law.

64.     As such, the amounts claimed by Boardriders as BI Loss are not "Business Interruption Loss" as defined by the Policy.

65.     An actual and justiciable controversy exists between GAIC and Boardriders regarding GAIC's obligations under its Policy with respect to the Cyber Incident.

66.     By virtue of the foregoing, GAIC is entitled to a judgment declaring that there is no coverage under the Policy for any BI Loss Boardriders continues to seek from GAIC.

## <u>COUNT II</u>

### **(Declaratory Relief – Billabong Not an Assured)**

67.     GAIC re-alleges each and every allegation contained in Paragraphs 1 through 66 as though fully set forth herein.

68.     Subject to its terms and conditions, the Policy provides in relevant part that the **Assured** shall be automatically amended to include any newly acquired subsidiary on the following pertinent basis: "any newly acquired subsidiary whose market value at the date of acquisition is less than 25% of the **Assured**'s market value is automatically covered for the remainder of the policy period, provided that with respect to the new acquisition there are no threats or incidents ongoing at the time of acquisition." (Policy Condition 3.11, as amended by Enhanced GAIC SCR Amendatory Endorsement).

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

69.     As the Insured, it is Boardriders' burden to prove Billabong qualifies as an **Assured** under the Policy.

70.     Boardriders has never provided information sufficient to show that Billabong's market value at the date of acquisition was less than 25% of Boardriders' market value, as required for coverage to be available to Billabong under the Policy.

71.     As such, Billabong is not an **Assured** under the Policy.

72.     Therefore, the amounts claimed by Boardriders as BI Loss attributable to Legacy Billabong stores are not covered under the Policy.

73.     An actual and justiciable controversy exists between GAIC and Boardriders regarding GAIC's obligations under its Policy with respect to the Cyber Incident.

74.     By virtue of the foregoing, GAIC is entitled to a judgment declaring that there is no coverage under the Policy for any additional Legacy Billabong BI Loss Boardriders continues to seek from GAIC.

## COUNT III

### (Reimbursement)

75.     GAIC re-alleges each and every allegation contained in Paragraphs 1 through 74 as though fully set forth herein.

76.     As outlined above, GAIC has paid millions of dollars to Boardriders under the Policy as reimbursement for its claimed BI Loss arising from the Cyber Incident in an attempt to resolve the parties' coverage dispute in good faith.

77.     GAIC's payments included an advancement of $3.1 million on December 23, 2020 toward Boardriders' claimed BI Loss attributable to Legacy Boardriders. GAIC's payment was made expressly subject to a reservation of rights that included the right to recoup that payment should it be determined those amounts were not covered under the Policy or otherwise not supported by Boardriders.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

78.     Information provided by Boardriders, including information provided subsequent to GAIC's December 23, 2020 payment, illustrates that a significant portion of that payment is not covered under the Policy, and that Boardriders will be unable to demonstrate the required direct causal connection between its claimed BI Loss and the Cyber Incident.

79.     Accordingly, GAIC is entitled to reimbursement from Boardriders of the significant portion of GAIC's $3.1 million payment that is not covered under the Policy.

## **PRAYER FOR RELIEF**

**WHEREFORE**, GAIC respectfully prays for judgment:

a.   That the Court declare that the amounts sought by Boardriders do not constitute "Business Interruption Loss" under the Policy;

b.   That the Court declare the Policy does not cover amounts sought for Legacy Billabong BI Loss because Billabong is not an "Assured" under the Policy;

c.   That the Court award GAIC reimbursement of amounts it paid Boardriders that are not covered under the Policy under Count III in an amount to be proven at trial;

d.   That the Court award GAIC pre-judgment and post-judgment interest in accordance with law;

e.   That the Court award GAIC its expenses and costs incurred in this action; and

f.   That the Court award GAIC such other and further relief as it deems just and proper.

## **JURY TRIAL DEMANDED**

GAIC demands a jury trial of all issues so triable.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: September 27, 2021

TROUTMAN PEPPER HAMILTON
SANDERS LLP

By:  */s/ Kevin F. Kieffer*
     Kevin F. Kieffer

Attorneys for Defendant
GREAT AMERICAN INSURANCE
COMPANY

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA  92614-2545